Nott, J.,
dissenting:
The court bas determined as a fact in the case that Assistant ■Quartermester Scott, on the 25th July, 1865, at Brazos, Texas, issued an ordinary written sailing order to the captain of the Tappahannock requiring him to have his vessel “ready tomorrow morning at 5 o’clock to be piloted across the bar,” and also that there was neither objection on the part of the captain, nor compulsion on the part of the quartermaster. I agree that the injury resulting from the vessel’s sailing under this order and amid these circumstances was a marine risk, to be borne, according to the terms of the charter, by the owners; and that so far, the case comes within the ruling in the recent case of Reybold.
But the court also has found the fact that after the first injury suffered in attempting to cross the bar under that sailing-order, the quartermaster did peremptorily require the captain to proceed to sea forthwith against his, the captain’s, objections. The justification of this compulsion was a military necessity; and the action of the quartermaster may be best stated in his own words:
“ I gave the second order for the Tappahannock to proceed on her voyage, and my order was imperative. The exigency of the service required me to give this second order. These damages were sustained on her second attempt to proceed on her voyage. These orders were given by virtue of my office of quartermaster. I assumed the responsibility of giving the second order in consequence of orders received by me; and that if any damages were sustained by the vessel, I do not consider the officers of this vessel to blame.”
Upon these facts and upon the clause of the charter-party which declares, “ The war risk to be ‘borne by the United States ; the marine risk to be borne by the oivners,” the case has been elaborately argued, and, I must add, greatly obscured by the too much learning that has been thrown around it.
These charters of vessels in the government’s military service separated, by this insurance clause, all the risks that could assail a vessel into two classes: the one consisting of risks incident to military operation; the other of risks incident to navigation. The government, assumed the responsibility of such risks as might arise from the war’s dangers into which *196 they might bring the vessel: the owners assumed the responsibility of such as might result from tlieir navigation of then-own vessel.
These several responsibilities implied reciprocal rights. Each party’s covenant related to his own acts, and undertook no responsibility for the acts of the other. The owners could not thrust the vessel into battle against orders and recover of the defendants, if she were lost, under their covenant against the war risk; the government could not compel the vessel to run on a reef and then say that her wreck came within the express terms of the owners’ marine risk. When the charter required that the vessel should be kept tight, staunch, and strong u at the cost and, charge of the owners,” and provided that u the time lost in consequence of any deficiency in these respects is not to he paid hy the United States,” it settled on the one hand the owners’ liability, and on the other their discretionary power. Should the defendants interfere with the master’s navigation of the vessel .they could not say that the resulting injury of their interference was a part of the owners’ marine risk. Marine risk implied marine discretion. If the defendants would exercise that discretion, they should, pro hac nice, assume the risk.
But would not such a construction, it might be asked, relieve the owners from the duties of the charter-party ? Might not the master allege, if he chose, that the voyage designated was too dangerous, the wind too high, or the tide too low, and remain in port ? Not so. The charter rate covered two elements, services and risk. When the vessel was ordered to sail she had a choice; to proceed and take the risk, to refuse and forego the pay. In this case the master, when he received the sailing-order, elected to take the risk. For that day’s service the vessel became entitled to her pay, and for that day’s loss the owners became liable for her damages. But when the master learnt by the first casualty the real danger of then crossing the bar, he elected not to take the risk. Under that election the vessel should have remained in port until the danger was past; and the owners should have forfeited her pay until she was ready to resume her service. This construction of these charters secures to the defendants their just rights, and holds the owners under a sufficient penalty to the performance of the vessel’s proper work.
*197 Among tbe other learned obscurities of tbe case is that of tbe law of insurers and insured. Brought down to an analysis it means nothing more than this: if the owners had insured the vessel against perils of the sea, &'c., then they might have recovered against the insurer; and if they did not insure their vessel then it was their own fault, and they must be held to be insurers themselves. This is a good deal as if a person, sued for tortiously taking a vessel, were to answer that the owners ought to sue the insurers, because the vessel was or should have been insured against piracy. Nothing can be plainer or simpler than that if the defendants caused the injury they are responsible for the damage. The reasoning that would transfer that responsibility from an offending party to an innocent insurer cannot accord with the justice of the law.
The owners’ case does not depend upon the insurance clauses, either for or against them. It comes within the principle in Schultz & Markly, (3 C. C1s. R., p. 56,) where all the judges were agreed that the owners should recover the contract rate of compensation.
The more I reflect upon it the more I am of the opinion that if a vessel in the government service on Lake Erie under one of these charters had been compelled by a quartermaster to pass down the Niagara River and over the falls, against the remonstrance of her master, the owners should not be held liable for the loss as a marine risk.
PeoK, J., concurred in this opinion.
Milligan, J., concurred with the opinion read by the Chief Justice.